IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 19, 2017 Session

## STATE OF TENNESSEE v. KEVIN ALLEN FLEMING

**Appeal from the Criminal Court for Campbell County**
**No. 16-654      E. Shayne Sexton, Judge**

**No. E2016-01746-CCA-R3-CD**

After a bifurcated trial, a jury convicted the Defendant, Kevin Allen Fleming, of one count of driving under the influence ("DUI"), fourth offense, and three counts of aggravated vehicular homicide. The trial court sentenced the Defendant to an effective sentence of forty-two years in confinement. At the motion for new trial hearing, the parties agreed that the Defendant's DUI fourth offense conviction should have merged into his conviction for aggravated vehicular homicide conviction, reducing his sentence to an effective sentence of forty years. No amended judgment appears in the record. On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to suppress the blood draw evidence; (2) the trial court erred when it admitted the results from the blood draw because the evidence was not authenticated and the chain of custody was not established; (3) the trial court erred when it admitted autopsy photographs of the victims; (4) the State violated his Fifth Amendment right to remain silent; (5) the trial court erred when it found that Trooper James Fillers was an expert witness; (6) the trial court erred when it admitted the written report of expert Dr. Davis because the report contained hearsay; (7) the trial court erred when it sentenced him; (8) the evidence is insufficient to sustain his convictions; and (9) the cumulative errors by the trial court constitute reversible error. After review and for the reasons stated herein, we affirm the trial court's judgments. We also remand the case for entry of an amended judgment reflecting that the Defendant's DUI fourth offense conviction is merged with one of his aggravated vehicular homicide convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**
**and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

James A.H. Bell (at trial), Knoxville, Tennessee, and Jessica M. Van Dyke (on appeal), Nashville, Tennessee, for the appellant, Kevin Allen Fleming.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Jared R. Effler, District Attorney General; and Graham E. Wilson and Blake Watson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from a single-vehicle accident that occurred on July 21, 2014, at 7:15 p.m. while the Defendant was driving and lost control of his vehicle, causing the death of the three passengers in his vehicle. A Campbell County grand jury indicted the Defendant, the driver and sole survivor of the accident, for one count of driving under the influence ("DUI"), fourth offense, and three counts of aggravated vehicular homicide.

### A. Motion to Suppress

Officers who responded to the accident scene drew the Defendant's blood, the driver of the vehicle involved in the accident. His blood tested positive for alcohol, cocaine, and Hydrocodone. Before trial, the Defendant filed a motion to suppress this evidence, contending that he did not actually consent to the blood draw and that he could not consent to the blood draw because of his medical state after the accident.

At a hearing on the motion to suppress, the parties presented the following evidence: John Tipton, an emergency medical technician with the Campbell County Emergency Medical Service, testified that he was trained to handle head trauma injuries. At scenes involving patients suspected of suffering from head trauma, Mr. Tipton would assess the subject using a Glasgow Coma Score ("GCS") This process involved three parts: (1) asking the patient his or her name, (2) asking where they are located, and (3) assessing whether they knew what event was going on. Mr. Tipton further explained that a GCS was a sliding scale from three to fifteen based upon a patient's verbal, eyes, and motor skills. Even if the patient was dead when he arrived, the patient would still have been a three on the scale. Someone who was alert and oriented was a fifteen on the scale.

Mr. Tipton testified that he responded to the accident in this case, and he saw three people lying on the ground and one still in trapped in the vehicle. Mr. Tipton noted that the Defendant was close to what he termed the "collapse zone," because he was only a few feet from the vehicle, which was on its side. Mr. Tipton called for assistance, stabilized the Defendant's spine, and pulled him away from the vehicle, which did ultimately collapse afterward.

Mr. Tipton noted that the Defendant suffered injuries during the car accident,

2

including swelling and a laceration near his right eye that necessitated suctioning. Mr. Tipton said that the Defendant knew that he was driving the vehicle at the time of the accident, what road he was on, who he was, that he had been in a wreck, and that he was in an ambulance. The Defendant offered that he had chronic back pain for which he took prescription Hydrocodone. He also said that he was not allergic to anything. Mr. Tipton gave the Defendant a GCS of fifteen out of fifteen. Mr. Tipton described the Defendant as compliant with him and said that he had no problems treating the Defendant.

During cross-examination, Mr. Tipton testified that he was the first responder to approach the Defendant, along with a paramedic-in-training, Samuel Roach. He said that this accident occurred during daylight hours. The vehicle had obviously rolled over several times before coming to a stop against a tree. Three of the vehicle's occupants were no longer in the vehicle, either having been ejected or exiting on their own. Mr. Tipton responded to the Defendant first because the Defendant was in danger of being hurt if the vehicle collapsed.

Mr. Tipton testified that the Defendant was covered in blood, especially on his face. The Defendant was blowing blood, which appeared to be coming from a deep laceration to his lip, out of his mouth. The Defendant's right eye was swollen shut. Mr. Tipton identified photographs taken of the Defendant at the hospital.

Mr. Tipton said that, in the ambulance, the Defendant resisted being strapped down, saying he could not breathe. Mr. Tipton believed it was because the Defendant was swallowing blood. The Defendant repeatedly asked about his dog, asking who had possession of the dog. Mr. Tipton said that there was, in fact, a dog at the scene. Mr. Tipton noted that, at that point, the Defendant's blood oxygen level was 89%, which was lower than the normal 94%. Mr. Tipton said he started an IV to administer fluids until the helicopter arrived to transport the Defendant to the hospital.

Mr. Tipton agreed that, after this incident, a Tennessee Highway Patrol ("THP") officer asked him to write a summary of what had transpired. Mr. Tipton complied and left his handwritten statement in the officer's box at the police station. Mr. Tipton recalled that he smelled the odor of blood coming from the Defendant during the forty minutes that he treated the Defendant. He did not recall the odor of alcohol coming from the Defendant.

During redirect examination, Mr. Tipton testified that someone contained the dog at the scene. When he was treating the Defendant, the Defendant accurately recalled that there was a dog with him.

Officer Joe Brown, with the THP, testified that he responded to the accident scene.

3

He saw that a Dodge pickup truck had veered off the right side of the roadway, over corrected, came back into the roadway, went up an embankment, rolled several times, and came to a rest against a tree in a field on the left hand side of the roadway. Mr. Tipton said that he spoke with the Defendant at the scene, while the Defendant was in the ambulance. The Defendant told the officer that he lost control of his truck as he attempted to pass a car. Officer Brown said that he did not want to get in the way of medical personnel, so he ended their conversation.

During cross-examination, Officer Brown testified that he filled out an alcohol influence report, indicating his suspicion that the Defendant was under the influence. Officer Brown said he was with the Defendant for between sixty and ninety seconds. He said that the Defendant's right eye was swollen, but his left eye looked okay. He also had a big cut to his lip as well as other cuts to his face. Officer Brown described the roadway where the accident occurred as very narrow with a steep grade and no shoulder. The officer clarified that the Defendant did not specifically say that he lost control of his vehicle, but the officer interpreted what he said to mean that the Defendant had lost control of his vehicle. Officer Brown said that he did not detect the odor of alcohol on the Defendant. The officer said that the Defendant did have bloodshot eyes.

Officer Brown said that he spoke with the medical examiner who informed him that one of the passengers had died at the hospital. Officer Brown agreed that he did not attempt to obtain a search warrant for the blood draw. Officer Brown said that he saw the Defendant at the hospital but that the two did not speak, and he did not give the Defendant any citations.

Randy Deadrick, a trooper with the THP, testified that he was dispatched to the University of Tennessee Medical Center with regard to this accident with instructions to obtain a blood draw. He located and spoke with the Defendant, who was in the emergency room. Trooper Deadrick said that the Defendant had bloodshot eyes, and when the Defendant recounted the accident, his speech was slurred. The Defendant told him that a cow had run out in front of him and that he had tried to dodge the cow. Officer Deadrick smelled what he thought was an alcoholic beverage on the Defendant's breath. Trooper Deadrick asked the Defendant if he was the driver, and the Defendant said yes. The Defendant offered that he had consumed a couple of alcoholic drinks at a bar and then left. Trooper Deadrick asked the Defendant if he would submit to a blood test to determine the alcohol and drug content of his blood, and the Defendant said yes. The Defendant also admitted that he had taken Hydrocodone earlier in the morning.

Trooper Deadrick said he watched the lab draw the Defendant's blood at 9:45 p.m. and then placed it in a Tennessee Bureau of Investigation ("TBI") box to be tested. Trooper Deadrick filled out the TBI alcohol and toxicology request.

During cross-examination, Trooper Deadrick agreed that, when he was dispatched, he was told that he had to do a mandatory blood draw. He further agreed that, on the implied consent form, he wrote that, because of the Defendant's "hospital trauma," he was unable to sign the form. Trooper Deadrick then checked the box indicating that the blood draw was mandatory. The trooper testified that his failure to mark the box that said that the Defendant consented was a "Mistake." Trooper Deadrick reiterated that he found the Defendant "alert" and talking and said he smelled of beer.

Trooper Deadrick agreed that his one-page statement, created close in time to these events, did not contain many of these details. He said, however, that he included all the details he remembered in his report, which was created some seven months after this incident.

Bobby Smith, a sergeant with the THP, testified that he responded to this accident scene and was there for a very brief period of time. He said he went to the hospital and located the vehicle's occupants, one of whom had died. Sergeant Smith testified that he went to where the Defendant was being treated and left the room after determining that his injuries were to such an extent that he could not be interviewed.

During cross-examination, Trooper Smith testified that he knew that night that Trooper Deadrick had requested a blood draw earlier that night from the Defendant.

Melissa Fleming, who was married to the Defendant at the time of this accident, testified that there was a trooper in her husband's hospital room when she arrived at the hospital. She said that the trooper was not speaking to her husband. Ms. Fleming said that the Defendant was in a neck brace at the time and hooked up to "some things." She took pictures of him with her cell phone. Ms. Fleming said that she did not smell alcohol on the Defendant. Ms. Fleming said that the Defendant had difficulty talking due to his injuries. She said that there were times during that night that he became more alert and others that he seemed to drift in and out of total consciousness.

During cross-examination, Ms. Fleming testified that she spoke with her husband while the trooper was in the room. She said that because the Defendant was "in and out" of consciousness, she was unsure whether he would have been able to consent to a blood draw when talking to the trooper. She said that when she spoke with him he was more coherent at some times than others.

During redirect examination, Ms. Fleming testified that her husband was on Hydrocodone for chronic back pain.

Based upon this evidence, the trial court denied the Defendant's motion to suppress.

## B. Trial

The case proceeded to a bifurcated trial on the indictments. The State first attempted to establish the Defendant's guilt of DUI, first offense, and vehicular homicide. During this portion of the trial, the parties presented the following evidence: John Tipton responded to this accident on July 21, 2014, in his capacity as an Emergency Medical Technician ("EMT") with the Campbell County Emergency Medical Service ("EMS"). He testified that, when he arrived at the scene, he determined that the vehicle was still occupied by Darrell Carroll. He also noted that the Defendant was in an area termed the "collapse zone," meaning he was in an area that was in danger of collapsing, so he responded to the Defendant first in order to move him to safety. The Defendant was "hurting" and did not say much. Mr. Tipton did a quick assessment and secured the Defendant in an ambulance. Mr. Tipton said that the Defendant stated that he was the driver the vehicle and that his vehicle had "come off the roadway." The Defendant asked about his dog that was at the scene, wanting to know if someone was taking care of it. The Defendant also asked about the occupants of his vehicle.

Mr. Tipton described the roadway where the accident occurred as "horribly narrow." He said that one would have to be alert when driving on the roadway, in part because it is hard to maneuver. During the ambulance ride to the hospital, Mr. Tipton asked the Defendant if he was taking any medications, and the Defendant said he was taking Hydrocodone.

Mr. Tipton identified a photograph of the truck involved in the accident, and he noted that the roof had been extricated off the truck.

During cross-examination, Mr. Tipton said that he saw the Defendant's dog at the scene, and he identified a picture of the dog. Mr. Tipton identified a picture of the Defendant, which showed that he was bleeding from both his mouth and his eyes. The Defendant's right eye was swollen shut. The Defendant did not remember the accident, but knew that he had been in an accident. The Defendant repeatedly asked about his friends and his dog. Mr. Tipton did not smell alcohol on the Defendant and only smelled blood. Mr. Tipton noted that the Defendant's blood oxygen level was low, but Mr. Tipton had a hard time getting the Defendant to accept oxygen. He said that the Defendant's head injury was of the "kind of magnitude" that it made him disoriented.

Joe Brown, a THP officer, testified that he arrived at the scene at around 7:30 p.m. on July 21, 2014. When he arrived, he saw a pickup truck lying on its side and medical

6

personnel attending to a patient trapped inside the vehicle. He also saw medical personnel attending a man who was lying on the left side of the roadway and two other people who were already loaded into ambulances, one of whom was the Defendant. The trooper asked the Defendant what had happened, and the Defendant responded that he was attempting to pass a vehicle when his pickup truck ran off of the roadway. The Defendant did not mention any animal running into the roadway.

Trooper Brown described the road where the accident had occurred as "very narrow." He said that it was possible for two cars to pass on the roadway but that one of the cars would be in the ditch line. Trooper Brown said that, from his preliminary investigation, it appeared that the pickup truck was traveling "fast" when it left the roadside on the right and went into the ditch. He said that it appeared that the driver had overcorrected and struck the embankment, which caused the vehicle to go into a roll. Trooper Brown identified a photograph of a Bud Light can that was located at the scene.

During cross-examination, Trooper Brown testified that some of the damage to the vehicle was sustained from the "jaws of life" being used to extract the vehicle's occupants. The trooper agreed that he did not cite speed as a factor in his initial accident report. He said that, as part of his investigation, he did not try to calculate the Defendant's speed at the time of the accident. Trooper Brown said he assumed the Bud Light can came from the vehicle, but he was not sure. Trooper Brown clarified that the Defendant told him that he was attempting to pass a vehicle coming the opposite direction, toward him, at the time he lost control of his truck.

Randy Deadrick, another trooper with the THP, testified that he was asked to go to UT Medical Center to retrieve a blood draw from the Defendant. Trooper Deadrick said that, at the time, he did not know the details of the accident. When he arrived at the hospital, he asked the Defendant what had happened. Trooper Deadrick said that the Defendant had watery, bloodshot eyes, had blood on him, smelled of beer, and was lying on a stretcher. The Defendant told the officer that a cow had run in front of his truck. He also told the officer that he had consumed a "couple" of alcoholic drinks earlier and that he had taken a Hydrocodone that morning. Trooper Deadrick was certain that the Defendant had not mentioned any dogs or other animals.

Trooper Deadrick testified that, at this point, he asked the Defendant to submit to a blood test, and the Defendant agreed. The trooper explained the process of the blood sample retrieval, and he was present when the Defendant's blood was drawn. The trooper said that after the blood was drawn, he took it to the district office, entered it into evidence, placed it in the evidence locker or "drop box," and left a copy of the paperwork with the evidence custodian, who then took it to the TBI crime laboratory.

7

During cross-examination, Trooper Deadrick said that the Defendant had his eyes open and was talking to him. He was unsure if the Defendant's eyes swelled shut after their conversation. Trooper Deadrick said that he created a memorandum summarizing his interaction with the Defendant four months after the interview. He said that, in his report, he noted that the Defendant had bloodshot eyes, constricted pupils, and smelled of alcohol. He said that he asked the Defendant to submit to a blood test, and the Defendant agreed. Trooper Deadrick testified that he also obtained blood draws from the other occupants of the vehicle.

Regina Aksanov, with the TBI crime laboratory, testified that her laboratory had a "drop box" where police officers could drop their blood evidence kits. At the end of each day, a specific evidence technician would then retrieve the kits from the drop box and store them in a secured vault in a refrigerator. In the following days, that same technician would open the boxes one at a time, look at the contents, document what was on the test tubes, and then assign the kit a unique laboratory number.

At this point, the Defendant objected to the chain of custody of the blood sample. He specifically contended that the State had not offered the testimony of the person who had drawn the blood and argued that the State had not shown that Trooper Deadrick, in retrieving all four of the vehicle's occupants' blood, did not mix up the samples. The trial court overruled the objection, finding that the State had shown a legal chain of custody.

Agent Aksanov then testified that she tested the Defendant's blood sample, which was collected at 9:45 p.m. The Defendant's blood tested positive for alcohol at a level of .07 percent. Agent Aksanov then explained that alcohol was a central nervous system depressant and it slowed down a person's senses. She said alcohol made a user's reaction times slower, made it harder for them to concentrate on more than one thing, caused slurred speech, and could make the user drowsy. She agreed that a blood alcohol level of .08 percent was the presumptive level of intoxication but said that one could be impaired at a "much lower" level.

During cross-examination, Agent Aksanov testified that, based upon the condition of the blood before testing, which she said had not clotted or degraded, she assumed that the instructions for obtaining and preserving the blood sample were followed. She said that she was required to go by what was labeled on the tubes as to whom the blood belonged, and she acknowledged that the blood of three individuals from the truck were taken within a fifteen minute period.

Stephanie Dotson, with the TBI crime laboratory, testified as an expert in forensic drug analysis and identification that she tested the Defendant's blood. She said that the

Defendant's blood tested positive for cocaine, cocaethylene, and also Hydrocodone. Agent Dotson testified that Hydrocodone was a central nervous system depressant and that cocaine, while affecting people differently, caused alertness and sometimes anxiety, confusion, restlessness, tremors, and insomnia, among other things. Cocaethylene, she explained, was a chemical the body produced when cocaine and alcohol were consumed simultaneously. She said that cocaethylene was "just as potent as [c]ocaine." She said it had a longer half-life, meaning that it would remain in the blood longer and produce euphoria longer in the body. Agent Dotson said that she was unable to quantify the amount of cocaine and cocaethylene because those substances are not stable in the blood, making them difficult to quantify.

During cross-examination, Agent Dotson testified that she did not quantify the amount of Hydrocodone in the Defendant's blood, although that was possible. She explained that she had "issues" with her instrument, which made her only able to report that it was positive and not the quantity.

Gary Michael Lees testified that he had lived in the area of the accident for over thirty years. He said that, around the time of this accident, he was working on a broken-down tractor. Mr. Lees said that, around 6:00 p.m., he heard a vehicle "under hard acceleration for a few seconds." He then heard tires sliding or going sideways on the roadway, followed by an impact, and a car horn continuously sounding. Mr. Lees said that he went to his garage and got on his motorcycle and rode toward the noise. He followed the sound of the horn toward the accident site. When he arrived, he saw a man in the road walking and asking for help. Mr. Lees told him to get out of the road and sit down.

Mr. Lees testified that he could see a vehicle on its side on the passenger side. He saw a man hanging from the driver's seat by a seatbelt or a shoulder harness. Mr. Lees called 911 but did not return to the accident scene. He said that the accident scene was "so bad" that there appeared to be nothing that he could do to help. He said that, as he called 911, he heard sirens approaching the area of the accident.

Mr. Lees testified that the road where the accident occurred was a "bad road." He said that, at most, one could safely travel twenty miles per hour. He said that the road was too narrow to safely accelerate quickly.

During cross-examination, Mr. Lees testified that he did not see any trash or beer cans in the area of the accident but that he had picked up beer cans on that road many times.

James Fillers, a trooper with the THP, testified as an expert in accident

9

reconstruction. He identified a scaled diagram of the accident scene that showed tire marks from the Defendant's vehicle. He said that the roadway was less than fifteen feet wide. Trooper Fillers testified that the Defendant's vehicle came to a rest 175 feet after it left the roadway. He said that, due to the dynamics of the crash, he could not determine the exact speed of the vehicle at the time that the Defendant lost control. He opined, however, that speed was a factor in the accident.

During cross-examination, Trooper Fillers testified that the posted speed limit of the roadway was thirty-five miles per hour.

Dr. Darinka Mileusnic-Polchan, the chief medical examiner for Knox and Anderson Counties, testified as an expert about the deaths in this case. She said her office performed a full autopsy on the body of Charles Morris because his death occurred shortly after the accident. Her office also performed a postmortem examination, without a full autopsy, on the bodies of Carl Daugherty and Darrell Carroll based upon their relative prolonged survival period.

Dr. Mileusnic-Polchan testified about the examination of Carl Daugherty. She said that his body arrived at her office three weeks after the accident. She said that her office received the medical records from the hospitals that treated Mr. Daugherty between the time of the accident and his death. Based on those records and the fact that his injuries were well documented during his hospitalization, a complete autopsy on the body of Mr. Daugherty, who died on August 13, 2014, was unnecessary. She said that the examination that they did perform, demonstrated some "residual trauma." Mr. Daugherty suffered broken bones, pelvic fractures, femoral fractures, a ruptured diaphragm, bleeding internal organs, a "splenic" rupture, and lung complications from an extended hospitalization. He eventually died primarily of pneumonia in his injured lungs. These injuries were consistent with a high speed motor crash. Dr. Mileusnic-Polchan identified photographs that her office took of Mr. Daughtery's body. Dr. Mileusnic-Polchan noted that the bilateral extensive fractures to Mr. Daughtery's pelvis were caused by "high velocity force." Dr. Mileusnic-Polchan declared that Mr. Daugherty's cause of death was multiple blunt force injuries from the automobile crash.

Dr. Mileusnic-Polchan then discussed Darrell Carroll's injuries. She said that he died sixteen days after the accident. In the interim between the crash and his death, UT Medical Center treated Mr. Carroll's injuries. Dr. Mileusnic-Polchan said her office accessed the medical center's records, including Mr. Carroll's x-rays and CT scans. Dr. Mileusnic-Polchan recalled that Mr. Carroll suffered extensive internal and external trauma, much like Mr. Daughtery. He also suffered "overwhelming" head trauma, which was the "main kind of mechanism" behind his death. Dr. Mileusnic-Polchan described the head trauma and identified photographs of Mr. Carroll's body.

Dr. Muleusnic described Mr. Morris's injuries, saying that he died within four hours of the accident. She said that an autopsy was necessary because of the short period of time Mr. Morris survived. During her examination, she discovered that Mr. Morris suffered multiple face fractures, skeletal trauma, chest injuries and trauma, contusions and bruising on his lungs, tearing of his liver, and a spleen laceration. His main mechanism of death was internal bleeding in his abdomen from his liver and spleen injuries. Dr. Mileusnic-Polchan identified photographs of Mr. Morris's body.

During cross-examination, Dr. Mileusnic-Polchan agreed that some of the injuries suffered by the three men could have been a result of being ejected from the vehicle.

Dr. Gregory James Davis, who was employed by the University of Kentucky College of Medicine, testified as an expert in the field of forensic chemistry and toxicology. He said that after a person consumed alcohol, that person would reach a peak of absorption in twenty to forty-five minutes. One drink would cause an average male, non-heavy drinker, to peak at about .02 blood alcohol content, and the average male will get rid of that amount of alcohol in their blood in about an hour. Dr. Davis discussed the formula for determining the Defendant's blood alcohol content ("BAC") at the time of the accident, extrapolating the time between the accident and the blood test.

Dr. Davis then testified that he assisted the TBI in examining the Defendant's BAC. He said that the Defendant's BAC at the time of testing, 9:45 p.m., was .07 percent. The time of the accident was 7:15 p.m. Dr. Davis testified that, assuming that the Defendant's last alcohol consumption was twenty to forty-five minutes or more before the collision, and his body absorbed alcohol at a standard, non-heavy drinker amount, his BAC at the time of the collision would have been between .108 percent and .12 percent. If he qualified as a heavy drinker, his BAC at the time of the accident would have been .145 percent to .17 percent. Dr. Davis discussed how this BAC would have affected the Defendant's reaction time, concentration, and judgment. Dr. Davis agreed that the TBI report also showed that the Defendant had consumed cocaine at the same time as alcohol. Dr. Davis discussed the effects of cocaine, including that it was a stimulant, kept adrenalin impacting one's nerves, and could cause aggressive and bizarre behavior. Dr. Davis discussed that the Defendant also had consumed Hydrocodone, and the effects of Hydrocodone on one's body.

During cross-examination, Dr. Davis testified that he and Dr. Mileusnic-Polchan had had professional disagreements about their respective findings. Dr. Davis agreed that, in one case, his testimony was excluded, but he explained that it was excluded based upon the fact that the parties could not agree about the time that the collision occurred, making his testimony not relevant. Dr. Davis agreed that men of different weights would

11

absorb alcohol at a different rate.

Bobby Smith, an officer with the Department of Safety who responded to this accident, testified on behalf of the Defendant that, after he went to the accident scene, he went to the hospital where the Defendant was being treated. He said that the Defendant's injuries seemed to be severe enough that he could not be interviewed at that time. During cross-examination, Officer Smith testified that the Defendant was not in the "trauma bay" for seriously injured patients at the time that the officer arrived at the hospital but instead he was in a small room where he was allowed to have visitors. Officer Smith also said that his conversation with the Defendant would have centered around the circumstances of the accident and would have taken longer than asking him to submit for a blood test.

Jimmy Taylor testified that he saw the Defendant between 4:30 and 4:45 p.m. the day of the accident. Two other men and the Defendant's dog accompanied the Defendant to the tire store where Mr. Taylor was working. The Defendant asked about a set of tires, and Mr. Taylor showed him some but informed him that he would not have time to change the tires, as the shop closed at 5:00 p.m. Mr. Taylor said that he did not smell alcohol on the Defendant and that the Defendant appeared sober.

During cross-examination, Mr. Taylor testified that he had known the Defendant for approximately two and a half years and had never known the Defendant to drink and drive. He said he did not think it was possible that the Defendant consumed alcohol after he left but before the accident. Mr. Taylor said he was surprised that the Defendant had a BAC of .07 at 9:45 p.m. that night and was also surprised that his blood tested positive for cocaine, saying that he had never known the Defendant to use drugs.

Dustin Daugherty, the son of one of the men killed in the accident, testified that he saw the Defendant shortly before this accident. He said that the Defendant's eyes did not appear bloodshot and that he did not smell alcohol on him. During cross-examination, Mr. Daugherty said he was not surprised that the Defendant, whom he had known for three years, had alcohol and cocaine in his system.

Jamie Lawson testified that she saw the Defendant driving his truck with three passengers at around 6:30 p.m. on the day of the accident. The Defendant was at her home talking to her husband when she came home from work. She said that none of the men appeared intoxicated or smelled of alcohol. Ms. Lawson said that she went upstairs to change her shoes, and that she heard the Defendant leave in his truck. She learned that there had been an accident between fifteen and twenty minutes later.

During cross-examination, Ms. Lawson testified that the road near her home where this accident occurred was a narrow, mainly one-lane road with ditches on either

side.  She said that she did not drive fast on the road.

Keith Delong testified that the Defendant, whom he had known for twelve years, was hired by his company to frame a house for him.  Two of the men who died in the accident also worked with the Defendant.  The men usually arrived at day break and left at around 3:30 for the day.  Mr. Delong said that the Defendant always had his dog with him and that he had worked the day of this accident and appeared sober.

During cross-examination, Mr. Delong agreed that he was unsure whether the Defendant consumed alcohol or drugs after he left the work site.

Melissa Fleming, the Defendant's wife, testified that the two had a ten-year-old daughter together.  Ms. Fleming taught first grade at a local elementary school, and the Defendant worked in construction.  Ms. Fleming recalled that, a few days before this accident, she and the Defendant had purchased a truck from her father.  The day of the accident, the Defendant awoke around 5:00 a.m. and took the family's dog with him to work.  Ms. Fleming said she spoke with the Defendant throughout the day because they were discussing that their daughter did not feel well and that they needed to make arrangements to go to her father's house that evening or the next evening.  Ms. Fleming said that the Defendant did not sound like he had used drugs or drank alcohol that day.

Ms. Fleming said that the men who died in the accident were like brothers to her husband.  She worked with one of their wives, and all of their families were close.

Ms. Fleming described the events at the hospital.  She said that there was a trooper in the Defendant's room when she arrived.  She said that, when she approached the Defendant, she could not smell alcohol and smelled only blood.  Ms. Fleming recalled the Defendant's injuries when she saw him, saying that his eye was cut and that he was having trouble moving and there were cuts and glass all over him.  Ms. Fleming recalled three troopers coming into the room later.

During cross-examination, Ms. Fleming testified that she and the Defendant took their daughter to the beach a few weeks after the accident.  She said that they had planned the trip before the accident and did not want to "lose all [their] money" by not going.  She said, however, the Defendant was not completely well.  She agreed that they went to Disney World during their trip.

Ms. Fleming said that the Defendant often drank one or two beers a day but that she never saw him drunk.  She said that she had never seen him use cocaine in their fourteen-year relationship.  She said she was "truly surprised" by the blood test results.  She said that when the two spoke on the phone that day, the Defendant gave no indication

that he was impaired by either drugs or alcohol.

Ms. Fleming said that when she was at the hospital with the Defendant, he was able to speak with her coherently from "time to time." The Defendant told her that something had darted out in front of him and that he had tried to not hit it. He told her that his wheels went off the side of the road and then back onto the roadway and that the rest was a blur. Ms. Fleming agreed that she did not mention the animal during her testimony at the preliminary hearing.

At this point in the bifurcated trial, the jury convicted the Defendant of one count of DUI and three counts of vehicular homicide.

The State then presented evidence in the second phase of the trial. Michael Heatherly, a trooper with the THP, testified and identified certified copies of the Defendant's three prior DUI convictions. The jury deliberated again and convicted the Defendant of DUI, fourth offense, and three counts of aggravated vehicular homicide.

### C. Sentencing

At the sentencing hearing, the State presented a number of victim impact statements from the victims' family members, some of whom asked for mercy for the Defendant who was their family friend. The Defendant called Bertha Hatmaker, Mr. Daugherty's sister, who described their close relationship. She said that she did not believe that speed was a factor in the accident, opining that Mr. Daugherty would have spoken up if the Defendant was driving too fast. She asked that the court be lenient on the Defendant. Christy Carroll, Mr. Carroll's wife, testified that the two had been married eighteen years at the time of his death and that they had a fourteen-year-old son together. She described the pain of losing her husband. Kaley Morris, Mr. Morris's daughter, described the sorrow of losing her father.

Tonya Monday testified that Mr. Carroll was her full brother and that Mr. Morris was her half-brother. She said that she and Mr. Morris did not have a relationship. Ms. Monday said that she watched Mr. Carroll struggle with drugs almost his entire life. She said she knew that the Defendant did not intend to hurt Mr. Carroll and that Mr. Carroll had prior DUI convictions himself and it could have been him driving. She said that she had never seen Mr. Carroll wear a seat belt and had seen him refuse to wear a seat belt. Ms. Monday said that Mr. Carroll would have wanted the Defendant to have a short prison sentence so that he could be there for the Defendant's young daughter. Ms. Monday said that the four men in the truck at the time of the accident were very close friends and that she was confident that Mr. Carroll would want the Defendant not to be punished for his actions that day.

During cross-examination, Ms. Monday agreed that not all members of her family shared her sentiments toward the Defendant. She said that both she and Mr. Carroll were aware of the Defendant's prior criminal history. Ms. Monday said that the last time she saw Mr. Carroll, he told her that when he turned forty the following year he was going to straighten up and change his life. She told him that he may not get that chance.

James Phillips, the Defendant's brother, testified that the Defendant had suffered a troubled childhood and was abused as a child both physically and verbally. The Defendant was forced to drink alcohol as early as eight or nine years old. Mr. Phillips said that he and the Defendant shared a mother but had different fathers. He described their mother as having "impairments" since her birth because she had been restricted of oxygen while being born. Mr. Phillips said that the Defendant was his older brother and that, once Mr. Phillips was born, Mr. Phillips's father "ostracized" the Defendant. Mr. Phillips said that his father spent much of his time in a bar and getting liquor and that they often went without heat and food. Mr. Phillips said that, as the Defendant aged, Mr. Phillips's father forced him to drink alcohol, saying that it would make him stronger as a man. Mr. Phillips said that the boys were poor and often teased based on their socio-economic status. He described the Defendant as often standing up for them.

Mr. Phillips said that the boys were taken into custody when their mother was hospitalized because they were living in a trailer with no food or heat. He said that the Defendant was placed with relatives but was often homeless with no place to spend the night. The Defendant dropped out of school early. Mr. Phillips said that the Defendant got married and had two children. The marriage was "tumultuous." His wife died and his son overdosed on drugs. The Defendant became estranged from his daughter.

Mr. Phillips said that the Defendant then met his second wife, Melissa. Mr. Phillips said that he began seeing positive changes in his brother, based on his love and respect for his wife. Mr. Phillips said that the Defendant sometimes relapsed and began using alcohol, such as in moments of family crisis, but that he would go long periods of time without using alcohol. The Defendant and Melissa had a daughter together, who was nine or ten years old at the time of sentencing. Mr. Phillips described the Defendant as being careful not to drink or curse around his daughter. Mr. Phillips said that the Defendant had not had a DUI arrest in ten years and that he had been trying to put all of that behind him.

Mr. Phillips described how the Defendant built a construction company through force and will. He said that the Defendant's friends who died in the accident were like his family. Mr. Phillips said that the Defendant repeatedly asked about the health of his friends after the accident and attempted to go and find them in the hospital. When he

learned of their death, "he broke down." Mr. Phillips said that he had never seen the Defendant so "broken" and "shattered" as after he learned the fate of his friends. The Defendant had, since the accident, repeatedly expressed his desire to trade places with his friends.

Mr. Phillips said that, after the accident, the Defendant completely turned his life around. He was baptized, and religion and his family became his focus. Mr. Phillips said the Defendant was never malicious in his wrongdoings but that his actions were a misguided attempt to deal with his pain. Mr. Phillips described his brother as sincere, honest, and giving. Mr. Phillips recounted how, after the Defendant's arrest, men came and helped Mr. Phillips clean up the Defendant's job site and tools, and each one refused payment, offering a story of how the Defendant had helped them when no one else would. Mr. Phillips asked for leniency for the Defendant.

During cross-examination, Mr. Phillips said that, while he lived 500 miles away, he and the Defendant had spoken about alcohol treatment, as they both had issues with alcohol. Mr. Phillips agreed that the Defendant received some of his criminal convictions after his marriage to his second wife. He said that the Defendant was a strong man and was used to people coming to him for help, so he was likely to not want to seek help himself.

The Defendant's pastor, David Seals, testified that he met the Defendant after the car accident. He said that the Defendant's wife had attended the church on a few occasions but that she was not a member. Church members heard about the car accident while at church one day and then learned that there had been deaths. Pastor Seals said that, after the accident, the Defendant was invited to a men's retreat. Pastor Seals arranged for the Defendant and him to share a room. The two had private conversations, where Pastor Seals learned that the Defendant was "brokenhearted, very remorseful of the things that had happened, [and] wanting very much . . . to make a difference in his life . . . ."

Pastor Seals said that he and the Defendant had become close and that the Defendant was a "very generous" and "loving" man. He described the Defendant as an asset to their church.

During cross-examination, Pastor Seals expressed his opinion that the Defendant may not have had cocaine in his blood based upon a recreational use but perhaps from a medical use.

The parties then discussed the possible range of punishment, with the minimum being fifteen years and the maximum being seventy-seven years of incarceration. The

State then provided the trial court with copies of eighteen prior convictions for the Defendant, contending that these convictions supported the application of enhancement factor (1), that the Defendant had a previous history of criminal convictions in addition to those necessary to establish his range. *See* T.C.A. 40-35-114(1). The State further contended that a second enhancement factor was applicable, namely that the Defendant failed to comply with the conditions of a sentence involving release into the community. *See* T.C.A. § 40-35-114(8). The State finally argued that the trial court should run the Defendant's sentences consecutively based upon the Defendant's extensive criminal history and because he was a dangerous offender.

The trial court sentenced the Defendant to two years for the DUI, fourth offense conviction and to twenty years, as a Range I offender, for each of the three aggravated vehicular homicide convictions. The trial court then ordered that two of the vehicular homicide convictions run consecutively and that the third run concurrently with the other sentences. It further ordered that the sentence for the DUI conviction run consecutively to the other sentences, for a total effective sentence of forty-two years of incarceration. At the motion for new trial hearing, the parties agreed that the Defendant's DUI, fourth offense conviction, should merge with one of his convictions for aggravated vehicular homicide, reducing the Defendant's sentence to forty years. The record does not contain amended judgments reflecting this finding.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to suppress the blood draw evidence; (2) the trial court erred when it admitted the results from the blood draw because the evidence was not authenticated and the chain of custody was not established; (3) the trial court erred when it admitted autopsy photographs of the victims; (4) the State violated his Fifth Amendment right to remain silent; (5) the trial court erred when it found that Trooper Fillers was an expert witness; (6) the trial court erred when it admitted the written report of expert Dr. Davis because the report contained hearsay; (7) the trial court erred when it sentenced him; (8) the evidence is insufficient to sustain his conviction; and (9) the cumulative errors by the court constitute reversible error.

### A. Motion to Suppress

The Defendant contends that the trial court erred when it denied his motion to suppress evidence obtained as a result of hospital personnel drawing his blood. Specifically, he asserts that he did not and could not have consented to having his blood drawn because of his injuries. He further asserts that any "mandatory" blood draw without a warrant was unconstitutional. The State counters that the evidence supports the

17

trial court's finding that the Defendant consented to the blood draw.

After the motion to suppress hearing, the trial court made the following findings in denying the Defendant's motion:

> [T]he Court must decide whether or not the blood testing results could come in based on how the blood was collected. The State has offered evidence that the [D]efendant was exposed to medical treatment, have offered proof from the EMT, also law enforcement . . . officers that were in and around the [D]efendant at the time that the blood was collected. The Defense has offered a state trooper who worked at the scene of the crime and also the wife of the [D]efendant.
>
> The Court's analysis is as follows: The question in many ways is taken away from the implied consent issue. As I see this, the question is simply, . . . was the [D]efendant able to make a straight consent to the blood draw. The State spoke of a case that was tried in this Court that's very similar in the nature of how the blood was collected, and thankfully in that case, the Appellate Court's upheld what we did in this Court. The question . . . as I see it is, was the [D]efendant able to consent to the officer asking for the blood draw, and in my opinion based on the proof that I heard, he was. The EMT rated him a 15 out of 15. [A]nd I know this is an evolving issue, this . . . can take different shapes as it goes, but there was no proof before this Court even offered from the [D]efendant's wife who, in my mind, . . . testified very candidly as to her observations of her husband. She also talked and . . . discounted any knowledge of what her husband may have said to the drawing officer. She just frankly said whatever he said, he said. I find that there is no credible proof that the [D]efendant was unable to consent to this blood draw . . . and I'm not even go[ing] to get into the mandatory checking. Frankly, the officer's characterization of why blood was taken or any search is irrelevant if it finds its way in through some other exception to a search warrant rule so, . . . that is an issue that I am not forced to address. So I'm finding that based on the [D]efendant's consent to the drawing officer, . . . [O]fficer Deadrick, [the Defendant's blood] was lawfully taken and [the results of the blood test] will be admissible at this trial.

When this Court reviews a trial court's ruling on a motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier

18

of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. *See id.* However, the application of the law to the facts found by the trial court is a question of law and is reviewed de novo. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and "'article 1, section 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment.'" *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Sneed v. State*, 423 S.W.2d 857, 860 (Tenn. 1968)). A blood draw conducted by law enforcement for use as evidence in a criminal investigation constitutes a search subject to constitutional protection. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013); *Schmerber v. California*, 384 U.S. 757, 769-70 (1966). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Yeargan*, 958 S.W.2d at 629 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)). Evidence discovered as a result of a warrantless search or seizure is subject to suppression unless the State establishes that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

Consent is one of the recognized exceptions to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In order to be valid, actual consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Ingram*, 331 S.W.3d 746, 760 (Tenn. 2011) (quoting *State v. Berrios*, 235 S.W.3d 99, 109 (Tenn. 2007)). "Whether an individual voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances." *Berrios*, 235 S.W.3d at 109. "The pertinent question is . . . whether the [individual's] act of consent is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." *State v. Cox*, 171 S.W.3d 174, 185 (Tenn. 2005) (citing *Schneckloth*, 412 U.S. at 225-26). Factors to be considered when evaluating the voluntariness of consent include the time and place of the encounter; whether the encounter was in a public or secluded place; the number of officers present; the degree of hostility; whether weapons were displayed; whether consent was requested;

and whether the consenter initiated contact with the police. *Id.* The State bears the burden of proving that the consent was freely and voluntarily given. *State v. Blackwood*, 713 S.W.2d 677, 680 (Tenn. Crim. App. 1986).

In accordance with our standard of review, we review the evidence before us by providing the State the strongest legitimate view of the evidence and all inferences drawn from the evidence. We further defer to the trial court's factual findings. Based upon the trial court's ruling, it inherently found that Officer Deadrick was a credible witness. We disagree with the Defendant that the evidence preponderates against the trial court's finding that Officer Deadrick was a credible witness. Courts of this state have repeatedly held that a trial court's denial of a defendant's motion to suppress "resolves all credibility issues against the defendant." *State v. O'Guinn*, 709 S.W.2d 561, 565 (Tenn. 1986).

The evidence presented regarding the suppression issue included that Mr. Tipton, the EMT who responded to the accident scene and attended to the Defendant's injuries, found the Defendant coherent. The Defendant knew that he was driving the vehicle at the time of the accident, what road he was on, who he was, that he had been in a wreck, and that he was in an ambulance. The Defendant offered that he had chronic back pain for which he took prescription Hydrocodone. He also said that he was not allergic to anything. The Defendant repeatedly asked about the welfare of his dog, and the Defendant's dog was in fact in the truck at the time of the accident. Mr. Tipton gave the Defendant a GCS score of fifteen out of fifteen. Mr. Tipton described someone who received a fifteen on the scale as "alert and oriented." At the scene, Officer Brown approached the Defendant and asked him what had happened. The Defendant told the officer that he lost control of his truck as he attempted to pass a car. Officer Brown ended the conversation, not wanting to get in the way of medical personnel. At the hospital, Officer Deadrick found the Defendant in the emergency room. He spoke with the Defendant, who informed him that a cow had caused the accident, that he had taken Hydrocodone that morning, and that he had consumed "a couple" of alcoholic drinks at a bar before the accident. The Defendant appeared "alert" to the officer. The officer asked the Defendant if he would consent to a blood test, and the Defendant said yes. The Defendant's wife described his state in the hospital, saying that at times he appeared lucid and at other times he seemed to drift out of consciousness.

Because of the trial court's ruling and our standard of review, to afford the Defendant relief on this issue, this Court would have to conclude that the trial court erred when it accredited Officer Deadrick's testimony that the Defendant consented to a blood draw. The evidence presented at the suppression hearing and the trial does not support that conclusion. We conclude that the evidence does not preponderate against the trial court's finding that the Defendant had the capacity to consent and that he did in fact consent to the blood draw. This renders moot whether the State had probable cause to

order the Defendant's blood drawn.

The Defendant specifically contends that, at the time of the accident, he suffered "severe head trauma and was bleeding profusely, even blowing blood from his airway." There was some evidence that the Defendant hit his head and that he was bleeding from his eye and mouth areas. The testimony from the EMT and the officer at the scene, however, was that the Defendant was alert and oriented, knew what had happened and where he was located, was able to describe his activities before the accident, asked about his dog that was in fact with him at the time of the accident, informed responders of his lack of allergies and the medicines he was currently taking. The Defendant's wife described him at the hospital as intermittently coherent and able to respond appropriately. As previously stated, the findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. In this case, the evidence does not preponderate against the trial court's finding.

### B. Chain of Custody

The Defendant next contends that the trial court erred when it admitted the results from the blood draw because the evidence was not authenticated and because the chain of custody was not established. He asserts that the State did not prove that the contents of the blood sample were what they were purported to be because the person who drew the blood did not testify. The State counters that it had proved chain of custody because Trooper Deadrick was in the room when the blood was drawn and testified that he sealed the kit himself with the blood inside before delivering it to the lab. Dr. Aksanov then testified about the procedures her lab undertakes when receiving this type of evidence, thereby sufficiently establishing the chain of custody.

We review challenges to the chain of custody of evidence under the abuse of discretion standard. *State v. Cannon*, 254 S.W.3d 287, 294 (Tenn. 2008) (citing *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000) and *State v. Beech*, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)). Under this standard, we will not reverse unless the trial court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *Id.* (citations omitted).

Tennessee Rule of Evidence 901(a) provides: "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." It is "'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" *Scott*, 33 S.W.3d at 760 (quoting *State v. Holbrooks*, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998)). This evidentiary rule is

designed to insure "that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *Id*. (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)).

> Professor Neil Cohen and his colleagues have aptly summarized the rule:
>
> > The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. In theory at least, testimony from each link is needed to verify the authenticity of the evidence and to show that it is what it purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

Neil P. Cohen et al., *Tennessee Law of Evidence* § 9.01[13][c] (5th ed. 2005) (footnotes omitted).

Each link in the chain of custody "should be sufficiently established," but the rule "does not require that the identity of tangible evidence be proven beyond all possible doubt; nor should the State be required to establish facts which exclude every possibility of tampering." *Cannon*, 254 S.W.3d at 296 (citing *Scott*, 33 S.W.3d at 760). To that end, the State is not required "to call all of the witnesses who handled the item." *Id.* Rather, "when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.* On the other hand, if the State fails to offer sufficient proof of the chain of custody, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." *Scott*, 33 S.W.3d at 760 (quoting Cohen et. al., Tennessee Law of Evidence § 901.12, at 624 (3d ed. 1995)).

The facts of this case are similar to three prior decisions of this court. In *State v. Earnest Laning*, this court held that there was "a sufficient chain of custody to reasonably assure the blood sample's identity and integrity" when the officer received the sample from a phlebotomist, the officer then placed the sample in a "locked evidence refrigerator" where it could only be removed by the evidence custodian but did not know

if the sample was mailed or hand-delivered to the TBI, the testing TBI agent testified that the sample was retrieved from the TBI's drop box, the TBI agent explained that the sample was received by an evidence technician who opened the package and "would have noted in the case file if someone had tampered with the box," and the TBI agent testified that the blood tube was still vacuum-sealed when she opened it. *State v. Earnest Laning,* No. E2011-01882-CCA-R3-CD, 2012 WL 3158782, at *3 (Tenn. Crim. App., at Knoxville, Aug. 6, 2012), *no Tenn. R. App. P. 11 application filed*.

Likewise, in *State v. Michael Joseph Arbuckle*, a panel of this court held that "the State established the identity and integrity of the evidence through a sufficient chain of custody" when the officer received a blood sample from the "hospital attendant" who drew the defendant's blood, the officer testified that he then placed the sample in an "evidence locker to be mailed to the [TBI] crime laboratory," and the testing TBI agent "testified regarding the procedure for receiving and documenting blood samples and that any irregularities in the shipping or receiving of the sample would have been noted" in the TBI file. *State v. Michael Joseph Arbuckle,* No. M2000-02885-CCA-R3-CD, 2001 WL 1545494, at *3 (Tenn. Crim. App., at Nashville, Dec. 5, 2001), *perm. app. denied* (Tenn. May 28, 2002).

In *State v. Pascasio Martinez*, this court recently held that results of blood testing was admissible when the State had presented evidence through the officer that he received the defendant's blood sample from the phlebotomist and transported it to the police station where he put it in the confiscation box to be transported to the TBI. *State v. Pascasio Martinez,* No. E2016-01401-CCA-R3-CD, 2017 WL 5613976 (Tenn. Crim. App., at Knoxville, Nov. 21, 2017), *no Tenn. R. App. P. 11 application filed*. In *Martinez*, the officer testified that he locked the box and dropped the key inside the box. Agent Aksanov, the same TBI employee testifying in the case before us, testified that the TBI file noted that the defendant's blood samples had been delivered to the TBI drop box. *Id.* at *3. She explained, as she did in this case, that an evidence technician would have removed the samples from the drop box, opened them, and noted in the TBI file any evidence of tampering. *Id.* There were no such notations in the TBI file, and Agent Aksanov testified that the defendant's blood samples appeared "well preserved" and were "not clotted" when she removed them. *Id.* This court concluded that the State established a sufficient chain of custody. *Id.*

In the case presently before us, summarizing Trooper Deadrick's testimony during the suppression hearing and at trial, he said that he filled out the lab request paperwork with the Defendant's identifying information. He said that lab technicians would put the subject's information on the tubes containing the subject's blood. Trooper Deadrick watched the phlebotomist draw the Defendant's blood and place the tubes in the TBI testing kit. Trooper Deadrick sealed the kit himself and noted that the Defendant's tubes

23

of blood were inside the kit. He took the kit to a secure evidence locker for delivery to the TBI crime laboratory. Agent Aksanov described the TBI evidence drop box, saying that it was like a mail box in that items could be placed into it but only TBI evidence technicians had the keys necessary to retrieve the items. Agent Aksanov testified about the procedures taken by the TBI crime laboratory upon receiving blood evidence, and she said that the TBI evidence technician receiving the kit would document the information on the tubes, including the subject's name and the number of tubes of blood, and note any evidence of tampering. Agent Aksanov verified that the evidence technician matched the information on the tubes submitted in the Defendant's case. She said the information included that the specimen was collected at 9:45 p.m. She said the blood samples appeared in "good condition," and there was "no clotting, it was not degraded." Agent Aksanov said that the information on the tube would have contained the Defendant's name, and that both the evidence technician and she would have individually verified that information.

The Defendant relies on, *State v. Michael R. Anderson*, No. M2008-01230-CCA-R3-CD, 2009 WL 856903 (Tenn. Crim. App., at Nashville, Mar. 31, 2009), *no Tenn. R. App. P. 11 application filed*. In that case, this court concluded that the results of the defendant's blood draw were not admissible because the State had failed to present evidence that the test kit received by the TBI was the same one submitted by the officer and because the State failed to present evidence about how the test kit was sealed. In *Michael R. Anderson* no one testified about how the kit was sealed or whether the kit was sealed. Those facts are clearly distinguishable from the case herein. The Defendant takes issue with the fact that the trial court's finding and the State's brief both rely upon the fact that "Trooper Deadrick's memory and testimony of that night [i]s totally credible." As we noted above, credibility determinations are made by the trial court, and the trial court by its ruling found Trooper Deadrick credible. Trooper Deadrick said that he saw the phlebotomist draw the blood from the Defendant and then sealed the blood himself into the kit bearing the Defendant's identification information. The fact that hospital staff may have also drawn blood from the passengers in the Defendant's vehicle, none of whom were in the same hospital room at the time, does not call into question the authenticity of the Defendant's blood evidence. Our standard of review requires us to defer to the trial court on issues of credibility and only overturn its rulings in the event that it abused its discretion, which it clearly did not in this case.

The Defendant also contends in his brief and reply brief that the failure of the State to present the phlebotomist who drew the Defendant's blood violated his rights pursuant to the Confrontation Clause. He asserts that, if this issue was not properly preserved for appeal by the failure to lodge an objection, then this Court should review the issue for plain error. While there is no Tennessee case directly on point, the Supreme Court of Delaware, addressing this issue squarely on point, held, "[t]he Sixth Amendment

24

Confrontation Clause does not require each and every individual who possessed the evidence to provide live testimony in order to establish chain of custody." *Milligan v. State*, 116 A.3d 1232, 1240 (Del. 2015). The Delaware case cites the United States Supreme Court's decision in *Melendez-Diaz v. Massachusetts*, which provides that not every individual who may have relevant testimony for the purpose of establishing chain of custody must appear in person as part of the prosecution's case. *Melendez-Diaz v. Massachusetts,* 551 U.S. 305, 311 n.1 (2009). We agree with the Delaware court's interpretation of the United State Supreme Court's decision. Accordingly, we conclude that the State established a sufficient chain of custody, that the trial court did not abuse its discretion in admitting the test results into evidence, and that the introduction of this evidence did not violate the Defendant's right of confrontation.

## C. Autopsy Photographs

The Defendant next contends that the trial court erred when it admitted the victims' autopsy photographs. He asserts that the photographs were graphic and potentially prejudicial and that their probative value did not outweigh their prejudicial effect. The State counters that the photographs aided the testimony of Dr. Mileusnic-Polchan and that, as noted by defense counsel at trial, they were not "that bad."

During the trial, the Defendant objected to the admission of the autopsy photographs pursuant to Tennessee Rule of Evidence 403. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The trial court must determine the relevance of the visual evidence and weigh its probative value against any undue prejudice. *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000). The term "undue prejudice" has been defined "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm. Notes). This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, *Handbook of Federal Evidence*, 182-83 (2d ed. 1986)). Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." *Banks*, 564 SW.2d at 951. Evidence which only appeals to the sympathies of the jury, conveys a sense of horror, or "engenders an instinct to punish" should be excluded. *Collins*, 986 S.W.2d at 20.

In *Banks*, our supreme court provided the trial courts with guidance for determining the admissibility of relevant photographic evidence. The trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Id*. at 951. The admissibility of relevant photographs of victims and the crime scene is within the sound discretion of the trial court, and the court's ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion. *Carruthers*, 35 S.W.3d at 576-77; *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *Banks*, 564 S.W.2d at 949. As our supreme court stated in *Carruthers*, the modern trend is to vest more discretion in the trial court's rulings on admissibility. 35 S.W.3d at 577 (citing *Banks*, 564 S.W.2d at 949).

"As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted." *Collins*, 986 S.W.2d at 21 (citing *State v. Duncan*, 698 S.W.2d 63, 69 (Tenn. 1985)). Photographic evidence may be excluded when it does not add anything to the testimonial description of the injuries. *Banks*, 564 S.W.2d at 951. Autopsy photographs often fall into this category. *Id.* This is especially true when the defendant does not dispute the injuries to the victim or cause of death. *See Banks*, 564 S.W.2d at 952 (autopsy photographs not probative when the defendant did not dispute that the victim's death was caused by multiple wounds to the face and head); *Collins*, 986 S.W.2d at 21 (autopsy photographs of a newborn not probative when the defendant did not dispute the fact that the baby was full-term and was born alive). If the defendant offers to stipulate to the facts shown in the photograph or the defendant does not dispute the testimony that the photographs illustrate, the more likely the prejudicial effect will substantially outweigh the photographs' probative value. *Banks*, 562 S.W.2d at 951.

After reviewing the photographs, we note that many of them depict portions of the victims' bodies, including wrist bands showing their names, ankles, and hands. The State offered, and the trial court entered, four total photographs of each of the three victims' faces. One photograph appears to show a man in a state of rest and does not appear gruesome. The probative value of two of the entered photographs, however, is outweighed by their prejudicial effect. Not at issue in the trial was whether the victims died as a result of their injuries from the car accident. The Defendant did not at all dispute that the accident was the cause of those injuries or that he was driving the vehicle at the time of the accident, but he instead took issue with the evidence indicating his intoxication at the time of the accident. Two of the pictures show the victims' bodies in various states after death, one even showing a large, covered open area on one of the victim's abdomen. This photographic evidence added little if any probative value to the medical expert's testimony, and it was error for the photographs to be admitted.

Whether the admission of the photographs constitutes reversible error requires a two-step analysis. First, we must determine whether the photographs were relevant to an issue the jury would be required to determine and whether their probative value was substantially outweighed by the danger of unfair prejudice. *See Banks*, 564 S.W.2d at 951; *Collins*, 986 S.W.2d at 20. Second, if the trial court abused its discretion and erred in admitting the photographs, we must determine whether such error was harmless. *See Banks*, 564 S.W.2d at 952-53; *Collins*, 986 S.W.2d at 21-22.

After reviewing the weight of the evidence against the Defendant, namely that the blood test to which he consented showed that he had consumed both alcohol and cocaine, we are convinced beyond any doubt that the jury would have rendered the same verdict of guilt had the photographs been excluded from the record. *See State v. Young*, 196 S.W.3d 85, 106-07 (Tenn. 2006). Had, however, the question of the Defendant's intoxication been less clear or the pictures more graphic, he would be entitled to a new trial. *See State v. Curtis Scott Harper*, No. E2014-01077-CCA-R3-CD, 2015 WL 6736747, at * 16 (Tenn. Crim. App., at Knoxville, Nov. 3, 2015), *no Tenn. R. App. P. 11 application filed*. The Defendant is not entitled to relief on this issue.

### D. Fifth Amendment Right

The Defendant next contends that the State violated his Fifth Amendment right to remain silent. He asserts that, during closing argument, the State improperly stated, "[T]he final element, that the killing was the proximate result of the driver's intoxication. That's one story that we haven't heard from [the Defendant]." He asserts that this was an improper statement regarding his right to remain silent. After the State's comment, the Defendant objected. The trial court ordered that the statement be stricken from the record. The trial court then advised the State to "refrain" from commenting on the Defendant's right to remain silent. The Defendant argues that, after this, the State also said during argument that there were no witnesses alive to contradict the Defendant's account of the events and that the Defendant had "secured the absence of the eyewitnesses." The Defendant finally takes issue with the State's comment to the jury, presumably based on the testimony of the Defendant's wife, that the Defendant went to Disney World shortly after this accident. The State counters that, since the Defendant objected at the time of argument and that the court sustained the objection and gave the jury a curative instruction, the Defendant is not entitled to relief. The State further contends that his other complaints lack merit.

Both the United States Constitution and the Tennessee Constitution "guarantee criminal defendants the right to remain silent and the right not to testify at trial." *State v. Jackson*, 444 S.W.3d 554, 585 (Tenn. 2014). "While closing argument is a valuable

privilege that should not be unduly restricted, . . . comment upon a defendant's exercise of the state and federal constitutional right not to testify should be considered off limits to any conscientious prosecutor." *Id*. at 590 (internal citations and quotation marks omitted). In addition to direct comments on a defendant's decision not to testify, "indirect references on the failure to testify also can violate the Fifth Amendment privilege." *Id*. at 587 (quoting *Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000)) (internal quotation marks omitted).

Closing argument is a valuable privilege that should not be unduly restricted. *State v. Dotson*, 450 S.W.3d 1, 99 (Tenn. 2014). As a result, "attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." *Id.* Nevertheless, "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). "While closing argument is a valuable privilege that should not be unduly restricted, . . . comment upon a defendant's exercise of the state and federal constitutional right not to testify should be considered off limits to any conscientious prosecutor." *State v. Jackson*, 444 S.W.3d 554, 590 (Tenn. 2014) (internal citations and quotation marks omitted); see *State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999) ("It is never proper for a prosecuting attorney to comment upon a defendant's decision not to testify."). Both direct and indirect comments on a defendant's failure to testify can violate the Fifth Amendment privilege. *Jackson*, 444 S.W.3d at 587.

The Tennessee Supreme Court has outlined "a two-part test for ascertaining whether a prosecutor's remarks amount to an improper comment on a defendant's exercise of the constitutional right to remain silent and not testify." *Jackson*, 444 S.W.3d at 587-88. Under this test, this court must consider: "(1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify." *Id*. at 588. Claims of impermissible prosecutorial comment on a defendant's right not to testify are reviewed *de novo*. *Id*. A prosecutor's comment on a defendant's right to remain silent is a non-structural constitutional error, and the State has the burden of establishing that the error is harmless beyond a reasonable doubt. *Id*. at 591. When determining whether the State has met its burden, this court "should consider the nature and extensiveness of the prosecutor's argument, the curative instructions given, if any, and the strength of the evidence of guilt." *Id.*

In this case, we first address *de novo* whether the prosecutor's remarks amount to an improper comment on the defendant's exercise of the constitutional right to remain

28

silent and not to testify. As to the first comment, the one regarding that the story of why he was intoxicated was the one story that the Defendant had not stated, we do not think that the prosecutor's "manifest intent was to comment on the defendant's right to testify." When placed in context, the State had just argued to the jury that the Defendant had offered multiple explanations for the cause of the crash: that a car had passed him on a narrow roadway, that he overcorrected, that a cow ran in front of the car, and that a dog caused the accident. The prosecutor then noted, however, that the Defendant had not offered his intoxication as an explanation for the accident, that the Defendant had given all of these other reasons for the accident but that the one "story" or explanation that he had not offered was that the accident was caused by his intoxication. We conclude that no curative instruction was necessary. The State was not commenting on the Defendant's failure to testify, it was commenting on his explanations being based on multiple reasons other than his intoxication.

As to the Defendant's remaining contentions about the State's argument, we conclude that those comments did not relate to the Defendant's failure to testify and did not exceed the leeway given to attorneys during argument. Regarding the State's comment "suggesting that [he] intentionally killed the victims in order to keep them from testifying," our review of the transcript does not comport with the Defendant's characterization. There was no evidence, and the State did not suggest, anything other than the victims were the Defendant's friends and that he did not want them to die. The State, in its argument, asserted that those witnesses were not present to contradict the Defendant's account of the accident because they were killed by his actions of driving while intoxicated, and that the Defendant, by his actions, "secured" their absence. We also do not find fault with the State arguing that it was "purely conjecture" that the blood samples were mixed up or its comment that the Defendant went to Disney World shortly after this accident. Additionally, the evidence against the Defendant was quite overwhelming. He was undisputedly the driver of the vehicle. His blood test showed the presence of Hydrocodone (as he had told police and EMT personnel), cocaine, alcohol, and ethylene, a substance the body produces when alcohol and cocaine are consumed together.

While the comments in this case did not entitle the Defendant to relief, the decision in this regard was made more difficult than necessary by the prosecutor's argument. We caution the State about infringing on a defendant's Fifth Amendment Right in this regard. This court has recently seen an influx in cases involving improper closing arguments. Our expectation is that, statewide, we see a tempering of such arguments by prosecutors.

### E.  Expert Witness Testimony

The Defendant asserts that the trial court erred when it found that Trooper James Fillers was an expert witness because: (1) he was not qualified as an expert; and (2) he could not provide any scientific foundation for his opinion that speed was a factor in the accident; and further that this error was not harmless. The State counters that Trooper Fillers was properly qualified as an expert and that, because the Defendant did not object at trial to Trooper Fillers's testimony about speed being a factor in the accident, he cannot now properly raise that issue on appeal.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. Rule 702, which addresses the need for expert testimony and the qualifications of the expert, provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." The Tennessee Supreme Court defined the role of trial courts in determining the admissibility of expert testimony:

> Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

*State v. Scott*, 275 S.W.3d 395, 401-02 (Tenn. 2009) (internal citations and quotation marks omitted). The witness's necessary expertise may be acquired through formal education or life experiences. Neil P. Cohen et al., *Tennessee Law of Evidence* § 7.02[4] at 7-21. However, the witness must possess such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise exceeds the scope of common knowledge and experience possessed by the average person. *Id.* (citations omitted).

Tennessee Rule of Evidence 703 provides guidance regarding the proper bases for expert testimony:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the

30

expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

"Generally speaking, the trial court is afforded broad discretion in resolving questions concerning the admissibility of expert testimony; in consequence, we will not overturn its ruling on appeal absent a finding that it abused its discretion." *State v. Ferrell*, 277 S.W.3d 372, 378 (Tenn. 2009) (citing *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404-05 (citing *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

The question before us first is whether the trial court abused its discretion when it qualified Trooper Fillers as an expert in accident reconstruction. According to the testimony, Trooper Fillers had attended a basic crash investigation course, an advanced crash school and reconstruction school, and an advance forensic mapping and diagramming school. The trooper articulated the principles with regard to accident reconstruction that he learned in each of these schools, and he said that he had performed reconstruction analysis on at least eighty cases. He had previously been admitted as an expert in other counties and had testified as an expert in a civil case. Accordingly, we conclude that the trial court did not abuse its discretion when it admitted Trooper Fillers as an expert.

The true crux of the Defendant's argument on appeal is that Trooper Fillers did not have a scientific basis to support his testimony that speed was a factor in the accident. The State counters that the Defendant did not object on these grounds below, thereby precluding Trooper Fillers from supporting his opinion with scientific data. The following occurred at trial:

[Question by the State]: Trooper, based on the roadway evidence, the damage to the tree, to the vehicle, the distance that this vehicle traveled, in your experience in reconstruction crashes such as this, did you believe that

speed was a factor?

[Answer by Trooper Fillers]:  Yes.

[Objection by Defense Counsel]: Your Honor, I object to that.  That's not the opinion yesterday.

[Ruling by the trial court]: Overruled.  You may cross-examine.

The Defendant's objection was clearly based upon the fact that Trooper Fillers's testimony was different from the prior day.  The objection did not present any indication that the Defendant did not think that there was an adequate scientific basis or foundation for the trooper's testimony.  The Defendant also did not raise this issue in his motion for new trial.  The Defendant in his reply brief points out that, during the jury-out hearing to determine whether Trooper Fillers was an expert, defense counsel questioned Trooper Fillers about "how he reached opinions in accident reconstruction."  This, however, does not amount to an objection that Trooper Fillers did not have an adequate scientific foundation for his opinion in this case.

We agree with the State that the Defendant has waived review of whether the trial court abused its discretion when it determined that Trooper Fillers had an adequate scientific foundation for his testimony.  This is true because he did not object to the foundation, providing the trial court the opportunity to request and hear the trooper's scientific foundation.  Rule 36(a) states that appellate relief is typically not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."  Tenn. R. App. P. 36(a); *see also State v. Sims*, 45 S.W.3d 1, 16 (Tenn. 2001).  A defendant must assert a contemporaneous objection to the expert's testimony if the State has failed to lay a proper foundation for it.  *See State v. James Thomas Manning*, No. M2004-03035-CCA-R3-CD, 2006 WL 163636, at *3 (Tenn. Crim. App., at Nashville, Jan. 24, 2006), *perm. app. denied* (May 1, 2006).

Accordingly, we conclude that the Defendant failed to preserve this issue by not contemporaneously objecting to Trooper Fillers's testimony on the grounds that it was not supported by a scientific foundation.  As such, he is not entitled to relief on this issue.

### F. Dr. Davis's Report

The Defendant contends that the trial court erred when it admitted the written report of expert Dr. Davis as substantive evidence because the report contained hearsay, violating the Defendant's right to confrontation.  The Defendant asserts that the report contained several testimonial statements about which Dr. Davis did not testify.  The State

counters that the Defendant failed to object to the report on these grounds until he filed his motion for new trial, thereby waiving the issue. Further, the State asserts that any error was ultimately harmless.

The record evinces that, at trial, the Defendant objected to the introduction of Dr. Davis's report as substantive evidence because it was cumulative to Dr. Davis's trial testimony. The Defendant did not contend that it contained hearsay or violated his right to confront Dr. Davis, who did in fact testify at trial. The Defendant for the first time in his motion for a new trial raised the Confrontation Clause issue.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay.

The Confrontation Clause of the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution prohibits the admission of testimonial hearsay unless the witness "was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 54 (2004). The Confrontation Clause applies only to testimonial statements. *Davis v. Washington*, 547 U.S. 813, 821 (2006); *State v. Franklin*, 308 S.W.3d 799, 810 (Tenn. 2010).

A testimonial statement "is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Crawford*, 541 U.S. at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). Testimonial statements include "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Id*. at 52 (quoting Brief for National Association of Criminal Defense Lawyers, et al. as Amicus Curie 3).

We first agree with the State that the Defendant has waived this issue for review by not objecting on these grounds during the trial. Tenn. R. App. P. 36(a). By not presenting his objection to the trial court, he necessarily prohibited the trial court from ruling on his objection on the ground that he now alleges. Tenn. R. Evid. 103(a)(1).

We further note that Dr. Davis testified during the trial, and his report was largely cumulative to his trial testimony, save a few additional statements. The Defendant had the opportunity to cross-examine Dr. Davis about the report and any statements contained in the report. In *State v. Dotson*, 450 S.W.3d 1, 73-74 (Tenn. 2014), the Tennessee

Supreme Court held:

> In [*California v. Green*, 399 U.S. 149, 162 (1970)] the Supreme Court overruled California decisions and held that "where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of [the] out-of-court statements does not create a confrontation problem." . . . . Thus, under both *Green* and *Crawford*, when a declarant appears for cross-examination at trial, "the Confrontation Clause places no constraints at all on the use of [the declarant's] prior testimonial statements." *Crawford*, 541 U.S. at 59 n. 9, 124 S.Ct. 1354; *see also People v. Argomaniz-Ramirez*, 102 P.3d 1015, 1018. ("Because the hearsay declarants will testify at trial and will be subject to cross-examination, admission of their out-of-court statements does not violate the Confrontation Clause"); *Clark v. State*, 808 N.E.2d 1183, 1189 n. 2 (Ind. 2004) (stating that the Supreme Court expressly noted in *Green* that, "where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem"); *State v. Gorman*, 854 A.2d 1164, 1178 (Me. 2004) (stating that, according to *Crawford*, the Confrontation Clause was satisfied when the defendant "was given the opportunity to examine and cross-examine his mother before the jury regarding what she did and did not recall and the reasons for her failure of recollection"); *Cooley v. State*, 157 Md. App. 101, 849 A.2d 1026, 1031 (2004) (holding that "*Crawford* did not overrule the unbroken line of cases holding that the Confrontation Clause does not operate to exclude pretrial statements made by a witness who actually testifies at trial"); *State v. Tate*, 682 N.W.2d 169, 176 n. 1 (Minn. Ct. App. 2004) (stating that because the declarant testified at trial and was subject to cross-examination, the Confrontation Clause did not apply to invalidate the hearsay exception); *State v. Carothers*, 692 N.W.2d 544, 547-49 (S.D. 2005); *Crawford v. State*, 139 S.W.3d 462, 464 (Tex. App. 2004) (stating that "[a] careful reading of the *Crawford* opinion reveals that its holding applies only when the extrajudicial testimonial statements of a witness who does not testify at trial are sought to be admitted").

The Confrontation Clause bars the admission of evidence when a defendant did not have the right to confront the declarant. This clause, therefore, was not violated because the Defendant was afforded the right and opportunity to confront and cross-examine Dr. Davis during the trial. The Defendant is not entitled to relief on this issue.

# G. Sentencing

The Defendant contends that the trial court erred when it sentenced him because it sentenced him to consecutive sentences, which created an excessive sentence. The State counters that the Defendant's sentence is within range and that his partially consecutive sentence was consistent with the purposes and principles of sentencing.

At the sentencing hearing, the parties discussed the possible range of punishment, with the minimum being fifteen years and the maximum being seventy-seven years of incarceration. The State then provided the trial court with copies of eighteen prior convictions for the Defendant. The trial court found that these supported the application of enhancement factor (1), that the Defendant had a previous history of criminal convictions in addition to those necessary to establish his range. *See* T.C.A. § 40-35-114(1). The trial court also found that the Defendant had failed to comply with the conditions of a sentence involving release into the community based upon his receiving his third DUI conviction while on Community Corrections. See T.C.A. § 40-35-114(9). The trial court then sentenced the Defendant to two years for the DUI, fourth offense conviction and to twenty years, as a Range I offender, for each of the three aggravated vehicular homicide convictions. The trial court then, based upon the Defendant's extensive criminal activity, ordered that two of the aggravated vehicular homicide convictions run consecutively and that the third run concurrently with the other sentences. It further ordered that the sentence for the DUI conviction run consecutively to the other sentences, for a total effective sentence of forty-two years of incarceration. The trial court later merged the DUI conviction with one of the aggravated vehicular homicide convictions for a total effective sentence of forty years of incarceration.

In *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012) the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly

applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2014).

The Defendant contends that the trial court improperly relied upon his failure to get alcohol treatment as a basis for his consecutive sentencing. Based upon our review, however, we conclude that the Defendant in this case has not met the burden of demonstrating that his sentence is improper. The trial court sentenced the Defendant to a within range, actually a midrange, sentence. The trial court filed a detailed findings of facts to support the Defendant's sentence, and it stated that it had considered the purposes and principles of the Sentencing Act. The Defendant is not entitled to relief.

## H. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions because the "quantities of drugs and alcohol did not prove beyond a reasonable doubt that the cause of the accident was intoxication." The State counters that the Defendant's argument relies upon credibility determinations, which should not be revisited on appeal. It contends the evidence is sufficient to support the Defendant's convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the

absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Defendant asserts that the evidence was insufficient as a matter of law to sustain his conviction of the Class A felony aggravated vehicular homicide. "Vehicular homicide is the reckless killing of another by the operation of an automobile, . . . as the proximate result of: . . . The driver's intoxication, as set forth in § 55-10-401." T.C.A. § 39-13-213(a)(2). As relevant herein, "[t]he driver's intoxication, as set forth in § 55-10-401," includes his operation of a vehicle:

> [u]nder the influence of any intoxicant, marijuana, controlled substance, controlled substance analogue, drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess . . . .

T.C.A. § 55-10-401(1) (2014). As applicable in Defendant's case, aggravated vehicular homicide is defined as a vehicular homicide, as defined in § 39-13-213(a)(2), where: "(1) The defendant has two (2) or more prior convictions for: (A) Driving under the influence of an intoxicant; . . . ." T.C.A. § 39-13-218(a)(1)(A).

In this case, the evidence viewed in the light most favorable to the State proves that the Defendant consumed Hydrocodone, as prescribed, the morning of the accident. At some point before the accident, he consumed both alcohol (he had a .07 BAC) and cocaine, as revealed by his blood test showing positive for both of those substances and a third substance, cocaethylene, which is produced by simultaneously ingesting alcohol and cocaine. The Defendant then drove his vehicle. A witness heard a vehicle under "hard acceleration" before hearing the impact. He went to the scene where he saw that there was likely nothing that he could do to help based upon the extensive damage. Multiple witnesses described the roadway where the accident occurred as "horribly narrow." Trooper Fillers testified that based upon his experience, speed was a factor in the accident and the Defendant was the driver of the vehicle. This evidence supports the jury's finding the Defendant guilty of three counts of vehicular homicide and DUI. During the second phase of a bifurcated trial, the State offered evidence that the Defendant had three prior DUI convictions, supporting his conviction for DUI, fourth offense, and aggravated vehicular homicide. The Defendant is not entitled to relief on this issue.

## I. Cumulative Error

The Defendant finally contends that the cumulative errors by the trial court constitute reversible error. Our supreme court has stated:

> The United States Constitution protects a criminal defendant's right

38

to a fair trial; it does not guarantee him or her a perfect trial. We have reached the same conclusion with regard to the Constitution of Tennessee. It is the protection of the right to a fair trial that drives the existence of and application of the cumulative error doctrine in the context of criminal proceedings. However, circumstances warranting the application of the cumulative error doctrine to reverse a conviction or sentence remain rare.

The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial. To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.

*State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (citations omitted).

After review, we conclude that there was not more than one actual error committed in the trial proceedings and that the Defendant was not denied a fair trial. He is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgments of the trial court. We remand the case for entry of a judgments showing that the DUI, fourth offense conviction, is merged with one of the aggravated vehicular homicide convictions.

_____
ROBERT W. WEDEMEYER, JUDGE